Filed 11/22/13  P. v. Ramos CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244221 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA117053) |
| v. | |
| GAVINO CIRILO RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Reversed in part, modified in part, affirmed in part, and remanded with directions.

Matthew D. Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Gavino Cirilo Ramos, of second degree murder. (Pen. Code,[1] § 187, subd. (a).)  The jury further found gang and personal firearm use allegations true.  (§§ 186.22, subd. (b)(1)(C), 12022.53, subd. (d).)  The trial court found defendant had sustained five prior serious or violent felony convictions.  (§§ 667, subds. (a)(1) & (b)-(i); 1170.12.)  The trial court expressly declined to make a finding with respect to an alleged prior prison term.  (§ 667.5, subd. (b).)  We reverse the 30-year-to life sentence for second degree murder.  We direct the trial court on remand to either comply with section 1385, subdivision (a), or impose a 45-year-to-life sentence for second degree murder.  We modify the sentence imposed with respect to the section 667, subdivision (a)(1) prior serious felony convictions.  We direct the trial court, upon remittitur issuance, to either impose the section 667.5, subdivision (b) enhancement or to strike it and set forth its reasons for doing so.  We affirm the judgment in all other respects.

# II.  THE EVIDENCE

Defendant was charged in the single-count information along with two fellow gang members, the codefendants, Andres Verduzco and Isabel Ballesteros.  Defendant and Mr. Verduzco were tried together before the same jury.  Ms. Ballesteros was tried at the same time but before a separate jury.

Defendant was an active member of a Lynwood gang.  On August 13, 2010, at about 6 p.m., defendant went to a gang hangout on Blumont Road in South Gate.  The house was on the border of defendant's gang's territory.  At the time, Ms. Ballesteros operated a gambling machine there.  And a rival Compton gang member was selling methamphetamine from the location.  Defendant was accompanied by a fellow gang

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

member, Mr. Verduzco. Several people were in the garage smoking methamphetamine when defendant and Mr. Verduzco arrived. Among them were three or four members of the rival Compton gang. There was an ongoing, years-long feud between the Lynwood and Compton gangs. Defendant announced himself to the rival gang members. He then pulled a gun from his waistband or pocket and said, "Everybody get the fuck out." As people scattered, defendant fired his weapon. A rival gang member, Albert Reyes, was shot and died. The murder weapon was a Smith and Wesson or Glock semi-automatic pistol.

Four eyewitnesses saw defendant remove the weapon from his waistband or pocket and fire it. Paola Wing lived at the Blumont Road home. Gerardo Ibarra, a fellow gang member, temporarily lived there. Ms. Wing answered the door when defendant and Mr. Verduzco arrived at the house. They asked for Mr. Ibarra. Ms. Wing was surprised to see them. She said it had been a while since Mr. Verduzco had come by. It seemed odd to Ms. Wing that Mr. Verduzco would just show up. Ms. Wing told defendant and Mr. Verduzco there were rival gang members present. Defendant said, "That's cool." Ms. Wing led them to the garage. Defendant introduced himself by his gang moniker and identified his gang. Ms. Wing saw defendant take a gun from his waistband and wave it around in the air. Defendant said, "Everybody get the fuck out." Ms. Wing described defendant bringing his arm out from his side with the gun in his hand. She heard one gunshot. She did not see defendant fire the weapon. She did not see him aim it at any particular person.

Susana Cruz was a reluctant witness. She feared gang retaliation for being a snitch. Ms. Cruz was in the garage of the Blumont Road house smoking methamphetamine. She saw two men enter the garage. She observed the encounter between the two men and the rival gang members. She heard something that sounded like "hood." She testified she meant, "Like for me like when presenting themselves like, bring out their hood, bring out where they belong to," meaning their gang. Ms. Cruz saw one of the two men take a gun out of his pocket. He told everyone to leave. The gun seemed to go off by accident. In Ms. Cruz's opinion, it did not look like the man fired

3

the gun on purpose. Ms. Cruz was looking at the gunman when she heard the gunshot. It did not look like he was aiming it at anyone. Ms. Cruz admitted she never told law enforcement officers she thought the gunman fired accidentally. During the subsequent investigation, Ms. Cruz told Officer William Cotter that Ms. Wing started screaming when the gun went off. Ms. Cruz heard defendant say to Ms. Wing, "Shut the fuck up, bitch, or I'll kill you." Ms. Cruz also said that one of the rival gang members, the "cholo," had said something that caused the gunman to react and say, "Get the fuck out."

Yesenia Torres was in the kitchen washing dishes when defendant and Mr. Verduzco passed through on their way into the garage where the fatal shooting occurred. Mr. Verduzco had been at the Blumont Road house more than 20 times in the past. Ms. Torres saw him stand in the doorway to the garage. Ms. Torres heard defendant say, "Everybody get the fuck out." She saw defendant take a gun from his waistband with his right hand. Defendant aimed the gun toward a side door leading to the yard. Ms. Torres heard one gunshot. The victim was leaving the garage through the side door when he was shot.

Mr. Ibarra was not available as a witness at the time of trial. His prior recorded testimony was introduced. Mr. Ibarra had known defendant for a long time. Defendant had dated Mr. Ibarra's sister. The two men were fellow gang members. Mr. Ibarra had bragged to Ms. Wing about how close the two were. Mr. Ibarra was asleep in a chair in the garage when defendant and Mr. Verduzco entered. Mr. Ibarra woke up before he heard the gunshot. Mr. Ibarra saw something black in defendant's left hand. He heard a sound like a firecracker. Mr. Ibarra heard Ms. Wing screaming, "No, Gavino, No." Defendant was holding the black object sideways. Defendant and Mr. Ibarra spoke later that evening. Defendant told Mr. Ibarra the rival gang members should not have been gambling or selling narcotics out of the Blumont Road house. Defendant said the rival gang members were "not in line" and "out of bound." Later, Mr. Ibarra told Sergeant Shannon Laren that when he awoke in the garage, he saw defendant holding a gun. Defendant was holding the gun in his left hand. Defendant's arm was extended straight

4

out.  The gun was at a 45 degree angle and turned to the side.  Mr. Ibarra saw defendant pull the trigger.

Mr. Ibarra told Sergeant Laren about a subsequent conversation with defendant. After the shooting, defendant told Mr. Ibarra the rival gang members should not have been at the Blumont Road house, they were out of their boundary.  Defendant learned Mr. Ibarra was at the house.  Defendant had been trying to call Mr. Ibarra.  Defendant intended to tell Mr. Ibarra the rival gang members had to leave because they were out of their area.  Defendant was unable to reach Mr. Ibarra.  Defendant said he then went to the Blumont Road residence himself.

There was some evidence defendant went to the Blumont Road house to address a disagreement involving the gambling operation.  George Guera  was defendant's fellow gang member.  The two men had known each other for many years.  Mr. Guera operated gambling machines in multiple places in Lynwood, Compton, Bellflower and South Gate. Some of those places were residences.   Mr. Guera had placed a gambling machine in the Blumont Road garage.  Mr. Guera put Ms. Ballesteros, one of defendant's two codefendants,  in charge of that gambling machine.  Ms. Ballesteros and Ms. Wing—who lived in the home—evenly split the gambling profits.  A day or so prior to the shooting, a dispute arose after Ms. Ballesteros accused Mr. Ibarra of using counterfeit $20 bills. Ms. Wing told Mr. Ibarra what Ms. Ballesteros had said about him.  Mr. Ibarra confronted Ms. Ballesteros.  A heated argument ensued.  Ms. Wing heard Ms. Ballesteros threaten to have defendant "check" Mr. Ibarra.  To "check" Mr. Ibarra would be to put him in his place or discipline him.  Defendant testified he had heard about the dispute. Defendant went to the Blumont Road house to talk to Mr. Ibarra and Ms. Wing.  Sergeant Laren spoke to Mr. Ibarra about why defendant came to the house.  While testifying, Sergeant Laren was asked about the conversation with Mr. Ibarra, "You asked him . . .  if he believed that [defendant] and [Mr. Verduzco] were coming by to check him . . . ?" According Sergeant Laren, Mr. Ibarra's answer was, "No, definitely not."  In terms of the dispute over the $20 bill, Mr. Ibarra revealed to Sergeant Laren what defendant had said about the subject.  Defendant stated he could care less about the $20 dispute.

There was additional evidence defendant went to the Blumont Road house to retaliate against the rival gang for selling methamphetamine in territory claimed by his gang. Moises Medina, a member of the rival Compton gang, had been selling methamphetamine from the Blumont Road house. Ms. Wing was nervous when defendant and Mr. Verduzco showed up at her house because there were rival gang members present. She knew that some gangs did not like other gangs coming into their territory and selling drugs. Mr. Ibarra testified the shooting was about the rival gang coming into the area to sell narcotics. Sergeant Laren testified gangs are very territorial. They do not like other gangs selling narcotics in their area. It is a major offense. Deputy Fernando Sarti testified a gang would need permission to sell dope out of a house claimed by a rival gang. Absent permission, a verbal confrontation, beating or shooting was likely to occur.

Mr. Medina testified for the defense. He had been selling methamphetamine from the Blumont Road house. He was in the garage with two of his fellow gang members, including the victim, when three guys came in. Mr. Medina had never seen them before. He heard a gunshot. At the preliminary hearing, Mr. Medina testified the gunman said, "Everybody get the fuck out." Sergeant Cotter interviewed Mr. Medina following the shooting. Mr. Medina said three men entered the garage. He later said it was two men. The shooter said, "Get the fuck out of here." Mr. Medina did not want to identify anyone. Mr. Medina told Sergeant Cotter: "I don't want this on paper. I don't need that shit."

Defendant testified he: was unarmed when he arrived at the Blumont Road house; had not visited the home for eight or nine months; had been in drug rehabilitation and was not using methamphetamine anymore; did not know about the gambling operation; and had heard about an argument involving Mr. Ibarra and Ms. Wing. Defendant told Mr. Verduzco, "Let's go see if I can find [Ms. Wing] and [Mr. Ibarra] so I can talk to them." Defendant testified he was unarmed and did not know there were rival gang members present until Ms. Wing told him. Upon seeing Mr. Ibarra, defendant told everyone to get out. When asked why he ordered everybody to leave, defendant

6

answered: "Because it didn't concern them. So I figured, well, you know what, this is none of your business. You guys get out." Defendant testified Mr. Reyes first produced a firearm. Defendant testified: "He was withdrawing a gun from his waist with his right hand. I grabbed his gun with my left hand and then I grabbed the barrel. We began to struggle. I told him, 'Don't do it. Let it go.'" Other people in the room began to yell and run for the door. Defendant described the continuing struggle with Mr. Reyes: "[A]s I stripped it, I like snatched it out of his hand. When I seen - - he wasn't going to stop me, so I just snatched it out. In the process of snatching it out I jumped back. Jerked it. He went to turn towards the door. Everybody is already running. Everybody is bolting for the doors. [¶] So at that time as I jerked, I gripped the gun. As I gripped and pulled, that's when it discharged." Defendant then fled through the same door he had used to originally enter the room. Defendant took the gun with him when he fled. It was a Glock semi-automatic handgun.

Dr. Marvin Pietruszka, a pathologist, testified for the defense. Dr. Pietruszka testified the victim was shot from at least two feet away. There was no soot or stippling indicating a closer range.

III. DISCUSSION

A. Evidentiary Error

Defendant argues it was prejudicial error to admit Ms. Ballesteros's statement she was going to call defendant to "check" Mr. Ibarra. As noted, to "check" refers to putting a person in his or her place or disciplining the individual. Defendant asserts, "[The statement] supplied [defendant] with a sinister motive for going to the house on Blumont Road." Defendant further contends, "That statement gave the jury the indelible impression that [defendant] was an enforcer for [Mr.] Guera[, who ran the gambling operation,] and had been charged with 'putting things in order' for the . . . gang at the Blumont Road house." Defendant reasons that if the jurors believed he was a gang

7

enforcer, they would have rejected his claims:  he went to the house simply to resolve a dispute; he was unarmed; and that the gun fired accidentally.  We find no prejudice.

There was testimony Ms. Ballesteros said she was going let defendant know about Mr. Ibarra's counterfeit bills.  Upon defense objection, the trial court stated the evidence would be limited to defendant and Ms. Ballesteros.  The trial court directed the jury, "Ladies and gentlemen, you are only to consider this conversation she is talking about to Mr. Gavino Ramos and Miss Isabel Ballesteros."  In Mr. Ibarra's prior recorded testimony, the following was developed:  "Q  Did you tell the police that [Ms. Wing] told you that [Ms. Ballesteros] was going to call [Mr. Guera] and [defendant] to come check you?  [¶]  A  Yes  [¶]  Q  Did [Ms. Wing] tell you that?  [¶]  A  Yes."  Additionally, Sergeant Laren confirmed Mr. Ibarra's claim concerning Ms. Wing's intention to call Mr. Guera and defendant.  The trial court directed the jury that this evidence was limited solely to Ms. Ballesteros.

We need not determine whether the trial court erred.  We find the error, if any, was harmless under any standard.  (*Chapman v. California* (1967) 386 U.S. 18, 24*; People v. Watson* (1956) 46 Cal.2d 818, 836.)  The pivotal question was whether defendant was armed or unarmed and the shooting was intentional or accidental.  Defendant claimed he was unarmed.  Defendant testified it was Mr. Reyes who had a gun.  And defendant's version was that the gun discharged accidentally during a struggle with the victim.  Defendant's version of the events was not corroborated.  There was no evidence any other person present was armed.  Prior to defendant's arrival in the garage, Ms. Wing had not seen anyone with a gun.  She had not heard anyone talk about having a gun.  Mr. Medina was selling methamphetamine in the garage.  Ms. Torres had not seen Mr. Medina with a gun.  Mr. Medina did not mention having a gun.  Four eyewitnesses saw defendant remove a gun from his waistband or pocket immediately prior to the shooting.  No witness saw defendant struggle with anyone.  Even Mr. Medina, who testified for the defense, did not testify about any struggle.  None of the people present saw Mr. Reyes with a gun or saw defendant struggle with the victim.  Further, there was substantial evidence defendant's motive was to retaliate against the rival gang for selling

8

methamphetamine in defendant's gang's territory.  Given that evidence, Ms. Ballesteros's statement could not have prejudiced defendant's case under any prejudice based standard of reversible error.

### B.  Sentencing

#### 1.  Section 667, subdivision (a)(1)

The trial court enhanced defendant's sentence by 25 years under section 667, subdivision (a)(1).  Defendant contends, the Attorney General concedes, and we agree defendant was subject to only one five-year section 667, subdivision (a)(1) prior serious felony conviction enhancement for an offense brought and tried separately.  (§ 667, subd. (a)(1); *In re Harris* (1989) 49 Cal.3d 131, 136; see *People v. Wiley* (1995) 9 Cal.4th 580, 583.)  The judgment must be modified to so provide.

#### 2.  Sections 667, subdivisions (b) through (i) and 1170.12

The information alleged defendant had three prior convictions within the meaning of sections 667, subdivisions (b) through (i) and 1170.12 (case No. TA026160).  Defendant waived his jury trial right as to those allegations.  The trial court found defendant had five such prior convictions.  Defendant's current conviction is for second degree murder, a violent felony.  (§ 667.5, subd. (c)(1).)  The trial court sentenced defendant to 15 years to life for second degree murder, doubled, for a total of 30 years to life.  That sentence did not comply with the statutory sentencing scheme.  In sentencing defendant for second degree murder, the trial court was required to first calculate the greatest minimum term under three statutory options.  (§§ 667, subd. (c)(2)(A), 1170.12, subd. (c)(2)(A); *People v. Dotson* (1997) 16 Cal.4th 547, 550.)  Under the first option, the term otherwise provided for second degree murder is 15 years to life.  Three times that term is 45 years to life.  (§§ 667, subd. (c)(2)(A)(i), 1170.12, subd. (c)(2)(A)(i); *People v.*

*Acosta* (2002) 29 Cal.4th 105, 116; *People v. Dotson, supra,* 16 Cal.4th at p. 552.) The term under the second option is 25 years. (§§ 667, subd. (c)(2)(A)(ii), 1170.12, subd. (c)(2)(A)(ii); *People v. Dotson, supra,* 16 Cal.4th at p. 552.) Under option three, the sentence would be 45 years to life. The minimum term would be 15 years to life for second degree murder. Added to that term is 25 years to life for firearm use (§ 12022.53, subd. (d) and 5 years for the prior conviction. (§§ 667, subd. (c)(2)(A)(iii), 1170.12, subd. (c)(2)(A)(iii); see *People v. Dotson, supra,* 16 Cal.4th at p. 553.) Therefore, the greatest minimum term was 45 years to life**,** not 30 years to life.

Defendant argues we should presume the trial court exercised its discretion under section 1385, subdivision (a) and struck a prior conviction. There is no basis for such a presumption. The trial court never expressed its intent to strike a prior conviction allegation. Moreover, the trial court failed to set forth in the minutes any reasons for striking a prior conviction allegation as required by section 1385, subdivision (a). Under these circumstances, we cannot presume the trial court struck a prior conviction allegation. (See *People v. Williams* (1998) 17 Cal.4th 148, 162; *People v. Hunt* (1977) 19 Cal.3d 888, 896-897; *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 532; *People v. Orin* (1975) 13 Cal.3d 937, 943-944.) Any intent to strike a prior conviction allegation was invalid. (*Ibid.*; see *People v. Allan* (1996) 49 Cal.App.4th 1507, 1515.) Upon remittitur issuance, the trial court must either comply with section 1385, subdivision (a) or impose a 45-year-to-life sentence for second degree murder.

### 3. Section 667.5, Subdivision (b)

The information alleged defendant had served a prior separate prison term in case No. TA026160. The trial court specifically declined to make any finding with respect to that allegation. The trial court had authority to strike the prior prison term allegation or the punishment for the enhancement, but it was required to set forth in the minutes its reasons for doing so. (§ 1385, subds. (a) & (c)(1); *People v. Torres* (2013) 213 Cal.App.4th 1151, 1161; *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1559-1563.)

10

Upon remittitur issuance, the trial court must either impose the enhancement or strike it and set forth its reasons for doing so.

## IV.  DISPOSITION

The sentence is reversed insofar as the trial court imposed a 30-year-to-life sentence for second degree murder.  Upon remittitur issuance, the trial must either comply with Penal Code section 1385, subdivision (a) and strike the prior serious conviction, or impose a 45-year-to-life sentence for second degree murder.  The sentence is further modified to impose only one five-year section 667, subdivision (a)(1) prior serious felony conviction enhancement for an offense brought and tried separately.  Upon remittitur issuance, the trial court must impose or strike a one-year enhancement under Penal Code section 667.5, subdivision (b).  If the trial court determines to strike the prior prison term enhancement, it must state in the minutes its reasons for doing so.  The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.


We concur:


KRIEGLER, J.


KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11